**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 25-20628
Hon. Denise Page Hood

MALACHI YOUNG,

Defendant.
_________________________________/

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS [ECF NO. 17], DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS [ECF NO. 18], AND DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [ECF NO. 19]**

## I. INTRODUCTION

Before the Court are Defendant Malachi Young's motion to dismiss the one-count indictment, motion to suppress Defendant's statements during his custodial interview, and motion to suppress evidence seized during a warrantless search and seizure of Defendant's personal property. [ECF Nos. 17, 18, 19]. The motions are fully briefed. [ECF Nos. 26, 29, 30, 39, 40]. For the reasons set forth below, the motions are DENIED.

## II. BACKGROUND

On August 4, 2024, a criminal complaint was filed alleging that Defendant Malachi Young ("Defendant" or "Young") knowingly possessed ammunition that had previously traveled in and affected interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1). [ECF No. 1, PageID.8]. The criminal complaint alleges that on May 31, 2024, at approximately 1:21 a.m., Detroit Police Department ("DPD") officers responded to a non-fatal shooting. [ECF No. 1, PageID.4]. DPD officers were flagged down by the victim ("V1") in the area of Plymouth and Asbury Park in Detroit, Michigan. *Id*. V1 identified herself as an Uber driver and reported that she was going to pick up a rider at 11401 Hubbell Ave. *Id*. When she arrived at the pickup location, it appeared that two unknown males were shooting at each other. *Id*. V1 said shots were coming from a silver SUV, but V1 was unsure of the make or model. *Id*. V1 immediately drove away onto Plymouth Avenue until she located police. *Id*. DPD officers documented seventeen holes in V1's Nissan Rogue caused by suspected gunfire. *Id*. DPD officers also observed a gunshot wound to V1's triceps area. *Id*. V1 was subsequently transported to a hospital for treatment of a gunshot wound. *Id*.

DPD officers responded to 11401 Hubbell to investigate further. During their investigation, DPD evidence technicians located fired cartridge casings ("FCCs") of multiple calibers around 11401 Hubbell. The FCCs found at the scene were: (1) five

.223 Remington FCCs; (2) nine 9-millimeter luger FCCs; and (3) ten 7.62x39 FCCs. [*Id*. at PageID.4-5]. While DPD officers were at the hospital with V1, nurses informed them that a second gunshot victim, later identified as Young, had arrived by private transportation shortly before V1. [*Id*. at PageID.5].

On August 11, 2025, Young was arrested for the alleged criminal violation and appeared before Magistrate Judge Kimberly Altman. [ECF Nos. 3, 10]. That same day, the Magistrate Judge ordered the temporary detention of Young and scheduled a detention hearing. [ECF No. 7]. On August 13, 2025, the Magistrate Judge presided over Young's detention hearing and issued an order of detention pending trial. [ECF No. 11]. The Court found that Young should be detained because the Government had shown "[b]y clear and convincing evidence that no condition or combination of conditions could reasonably assure the safety of the community" and "[b]y a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required." [ECF No. 11, PageID.21]. On August 21, 2025, Young was charged in a one-count indictment alleging that on or about May 31, 2024, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, Young knowingly possessed ammunition in violation of 18 U.S.C. § 922(g)(1). [ECF No. 12].

On November 5, 2025, Young filed a motion to dismiss the one-count indictment pursuant to the Second Amendment. [ECF No. 17]. On November 6, 2025, Young

filed a motion to suppress Defendant's statements during his custodial interview and a motion to suppress evidence seized from a warrantless search and seizure of Defendant's personal property. [ECF Nos. 18, 19]. The Government filed a response in opposition to Young's motion to dismiss on November 26, 2025. [ECF No. 26]. On December 10, 2025, the Government filed responses in opposition to Defendant's motions to suppress. [ECF Nos. 29, 30]. An evidentiary hearing commenced on January 8, 2026. Young filed a supplemental brief on January 22, 2026, and the Government filed a supplemental response on January 30, 2026. [ECF Nos. 39, 40]. The evidentiary hearing continued on February 4, 2026.

## III. APPLICABLE LAW AND ANALYSIS

### A. Motion to Dismiss the Indictment Pursuant to the Second Amendment

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may seek dismissal of a defective indictment in a pretrial motion. Fed. R. Crim. P. 12(b)(3)(B). Here, Young seeks dismissal of the indictment against him, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him.

1. Second Amendment Framework

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *New York State Rifle & Pistol*

*Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), the Supreme Court established a two-step framework for analyzing whether an individual's Second Amendment rights are violated and held that the regulation of those rights must be consistent with the "Nation's historical tradition of firearm regulations." *Id.* at 17.

To assess the constitutionality of a firearms regulation under the new framework in *Bruen*, the Court must follow a two-step approach. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

2. *Williams* Framework

The Sixth Circuit Court of Appeals clarified the impact of *Bruen* on Sixth Circuit precedent concerning the constitutionality of § 922(g)(1) in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). Ultimately, the Sixth Circuit found that in light of the Nation's history and tradition, "most applications of § 922(g)(1) are constitutional" and that the statute is constitutional on its face and "as applied to dangerous people." *Id*. at 646. However, the Court left open the possibility of an as-

applied challenge should a defendant prove he is not dangerous, "and thus falls outside of § 922(g)(1)'s constitutionally permissible scope." *Id*.

The *Williams* Court provided three categories under which to review a defendant's past conduct to guide the dangerousness analysis. In the first category are crimes against a person such as "murder, rape, assault, and robbery." *Williams*, 113 F.4th at 658. The Court noted that a history of violent crimes like these is "strong evidence that an individual is dangerous." *Id*. The second category includes crimes that are "not strictly crimes against the person, [but] may nonetheless pose a significant threat of danger." *Id.* at 659. The Court stated that convictions for these crimes will often "put someone's safety at risk, and thus, justify a finding of danger." *Id.* The Court emphasized that a person who falls into the first two categories will have a "very difficult time" showing that they are not dangerous. *Id*. at 663.

In the final category are "crimes [that] cause no physical harm to another person or the community," such as mail fraud and making false statements. *Id*. at 659. *Williams* provided that these cases are a "more difficult category" but that district courts will likely have no trouble concluding that many of these crimes do not make a person dangerous. *Id*. at 659, 663. When evaluating a defendant's dangerousness, a court may consider a defendant's entire criminal record, not just the specific felony underlying the § 922(g)(1) charge. *Id.* at 663. Courts may also consider judicially noticeable information when assessing a defendant's dangerousness. *Id*. at 660.

The Sixth Circuit compared the assessment to dangerousness determinations made under 18 U.S.C. §§ 3142 and 3553. *Id.* at 657. The dangerousness determination must be "fact-specific, depending on the unique circumstances of the individual defendant." *Id.* at 660. The defendant bears the "extremely heavy" burden of showing that he is not dangerous. *Id.* at 658, 662.

Since *Williams*, when determining dangerousness, the Sixth Circuit has considered both the conduct which led to the defendant's § 922(g)(1) charge and whether the defendant was on supervised release when the underlying conduct occurred. *See United States v. Vaughn.*, No. 23-5790, 2024 U.S. App. LEXIS 27730, 2024 WL 4615853 at *2 n.2 (6th Cir. Oct. 30, 2024) (concluding that "[t]he fact that Vaughn's § 922(g)(1) conviction resulted from an incident where he shot at an individual certainly would lend to a showing of his dangerousness"); *see also United States v. Goins*, 118 F.4th 794, 798 (6th Cir. 2024) (finding disarming individuals on parole, probation, or supervised release to be consistent with the Nation's history and tradition).

3. <u>Defendant's As-Applied Challenge</u>

The Court may consider the defendant's "entire criminal record" when determining dangerousness in connection with an as-applied challenge to § 922(g)(1). *Williams*, 113 F.4th at 659-60. Young's criminal record includes: (1) a 2024 felony conviction for larceny of $20,000 or more; (2) a 2024 felony conviction

for attempt possession of burglar's tools; (3) a 2024 felony conviction for fleeing a police officer; and (4) a 2021 felony conviction for fleeing a police officer. [ECF No. 26, PageID.204]. Young argues that his prior convictions are insufficient to support a finding that he is "dangerous," and the Government argues that Young has failed to meet his burden to prove he is not dangerous.

The Parties agree that Young's prior felony fleeing convictions fall within the second category of crimes identified by *Williams*. [*See* ECF No. 17, PageID.43-44; ECF No. 26, PageID.203]. Such crimes can "justify a finding of danger," because they "pose a significant threat of danger" to the community and "often lead[ ] to violence." *Williams*, 113 F.4th at 659.

The Court finds that Young's fleeing convictions support a finding of dangerousness. In one instance, Young repeatedly failed to stop his vehicle after officers activated their lights and sirens and was ultimately arrested after officers caught up with him. In the other, Young fled from officers during an extended vehicle pursuit that reached speeds as high as 125 miles per hour. During the pursuit, Young also drove through a red light and briefly traveled the wrong way on a one-way street. Similarly, courts in this district have found that high-speed flight from law enforcement poses a significant threat of danger to the public. *See, e.g.*, *United States v. Green*, No. 23-20506, 2024 U.S. Dist. LEXIS 185509, at *7 (E.D. Mich. Oct. 10, 2024) ("[The defendant's] conviction for fleeing and eluding involved danger to

others; his reckless driving while fleeing the police put members of the public at risk of injury or worse."); *United States v. Hales*, No. 23-20645, 2024 U.S. Dist. LEXIS 229835, at *14 (E.D. Mich. Dec. 19, 2024) ("[O]ne of Hales' convictions—felony fleeing and eluding in the third degree—is a crime in *Williams*' first category which were directly dangerous to others.").

The Parties dispute whether Young's felony larceny and attempt possession of burglar's tools convictions fall within *Williams'* second or third category. Young contends that these convictions fall within *Williams'* third category of crimes that "cause no physical harm to another person or the community." [ECF No. 17, PageID.43-44]. The Government, however, argues that Young's convictions fall within *Williams*'s second category. [ECF No. 26, PageID.203-204]. The Government contends that *Williams* recognized the danger that a burglary poses to a community because "it creates the possibility of a violent confrontation between the offender and [victim]." *Williams,* 113 F.4th at 659. [ECF No. 26, PageID.203].

The Court finds that Young's larceny conviction falls within *Williams'* second category. The conduct underlying the conviction involved Young and several other individuals illegally entering a vehicle storage lot that was being patrolled by a security officer. The security officer observed Young attempting to exit the lot in a vehicle, ramming the security barricades, and then exiting the vehicle and fleeing on foot before being detained by an officer. The conduct underlying Young's larceny

conviction involved more than the mere theft of property and posed a risk of danger to others. *See e.g.*, *United States v. David*, No. 2:23-CR-20626, 2025 U.S. Dist. LEXIS 25504, 2025 WL 475842, at *5 (E.D. Mich. Feb. 12, 2025) (finding that second-degree home invasion is akin to burglary and, therefore, in the second *Williams* category of crimes because it creates "potential for violent confrontation"); *United States v. Douglas*, No. 24-20196, 2025 U.S. Dist. LEXIS 47385, at *7 (E.D. Mich. Mar. 14, 2025) (finding that stealing cars, stealing from cars, and fleeing from police constituted a pattern of dangerous conduct). The Court, however, finds that Young's attempt possession of burglar's tools falls within the third category of *Williams* because mere attempt possession of burglar's tools "cause[s] no physical harm to another person or the community" and does not evidence dangerousness.

There are other indicia of dangerousness in this case. First, Young was on probation at the time he allegedly possessed the ammunition at issue in this case. *See Goins*, 118 F.4th at 801-02 ("[O]ur nation's historical tradition of forfeiture laws . . . also supports disarming those on parole, probation, or supervised release."); *see also United States v. Taylor*, No. 23-5644, 2024 U.S. App. LEXIS 30240, 2024 WL 4891756, at *2 (6th Cir. Nov. 25, 2024) (per curiam) (rejecting an as-applied Second Amendment challenge to a § 922(g)(1) conviction because,

"[l]ike the defendant in *Goins*, Taylor was also on probation when he possessed firearms in violation of § 922(g)(1)").

Most of Young's prior felony convictions are relatively recent. Several courts have recognized that the recency of a prior conviction is relevant to the weight afforded to that conviction in assessing dangerousness. *See, e.g.*, *United States v. Jennings*, 754 F. Supp. 3d 763, 770 (E.D. Mich. 2024); *United States v. Green*, No. 23-cr-20506, 2024 U.S. Dist. LEXIS 185509, 2024 WL 4469090 at *4 (E.D. Mich. Oct. 10, 2024); *United States v. Bell*, 755 F. Supp. 3d 992, 2024 WL 4589812, at *5 (E.D. Mich. 2024); *United States v. Nettles*, No. 3:24-CR-377, 2025 U.S. Dist. LEXIS 36060, 2025 WL 660185, at *6 (N.D. Ohio Feb. 28, 2025); *United States v. Wynn*, 797 F. Supp. 3d 817, 829-30 (E.D. Tenn. 2025); *United States v. Evans*, No. 24-20556, 2025 U.S. Dist. LEXIS 162744, at *7 (E.D. Mich. Aug. 21, 2025). Accordingly, the Court finds that the recency of Young's convictions weighs against him.

In addition, the Sixth Circuit has provided that courts may look to the facts underlying the instant offense when determining dangerousness. *See United States v. Fordham*, No. 24-1491, 2025 U.S. App. LEXIS 2150, 2025 WL 318229, at *5 (6th Cir. Jan. 28, 2025). The allegations in this case arise from a May 31, 2024, drive-by shooting in which an Uber driver en route to pick up a customer was caught in the crossfire and shot in the arm. [ECF No. 26, PageID.193]. DPD documented 17 holes

in the victim's car caused by suspected gunfire. [ECF No. 1, PageID.4]. The Government alleges that the spent casing Young allegedly possessed at the hospital that day generated NIBIN leads linking it to eight other shootings that occurred between January 2024 and May 31, 2024. [ECF No. 26, PageID.191-192, 194]. Notably, Young has not been charged with any offense arising from the shooting on May 31, 2024, or with possessing the firearm allegedly used in that shooting.

Because Young fails to offer persuasive evidence or argument to undermine a finding of dangerousness, the Court finds that Young has not met his burden of demonstrating that § 922(g)(1) is unconstitutional as applied to him.[1] Accordingly, the Court denies Young's motion to dismiss.

### B. Motion to Suppress Defendant's Statements During Custodial Interview

#### 1. Evidentiary Hearing Testimony and Video Evidence

Officer Bradley Tobel ("Officer Tobel") was a Detroit Police Officer at the time of Young's custodial interview and was assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as a task force officer. [ECF No. 37, PageID.536-537]. Officer Tobel was involved in the investigation of Young's alleged involvement in various shootings and testified at the evidentiary hearing on January 8, 2026. [*Id.* at PageID.541-542]. Officer Tobel testified that on August 2, 2024,

[1] The Court does not weigh Young's conviction for attempt possession of burglar tools as evidence of dangerousness.

Young turned himself in at the Macomb County Jail. [*Id*. at PageID.543]. The following day, around noon, other Detroit Police officers interviewed Young about a nonfatal shooting. [*Id*. at PageID.545]. Officer Tobel testified that he reviewed the report of one of the officers before interviewing Young later that day. [*Id*. at PageID.544]. He testified that the report reflected that Young waived his rights and agreed to speak to the other Detroit Police officers earlier that day. *Id*. Officer Tobel testified that he and his partner, ATF Agent Brendt Smith ("Agent Smith") then interviewed Young at the Macomb County Jail on August 3, 2024, around 4:45 p.m., after Young finished eating dinner. [*Id*. at PageID.542, 544, 550, 560].

Officer Tobel's approximately hour-and-a-half interview with Young was video and audio recorded, and excerpts of the recording were played at the evidentiary hearing. [Government's Exhibit A]. Officer Tobel's testimony was consistent with the video evidence of the interview. At the beginning of the video, Officer Tobel confirmed with Young that he had spoken to Detroit Police officers earlier that day and that he had been read his rights during that interview. [Gov. Ex. A, at 0:05–0:11]. Even so, Officer Tobel presented Young with a printed version of his rights so that Young could follow along as Officer Tobel read the rights orally. [*Id*. at 0:15–0:59]. After being read his rights, Young stated that he understood them. [*Id*. at 0:59–1:01]. Officer Tobel asked Young to initial and sign the Constitutional Rights Certificate of Notification. [*Id*. at 1:02; ECF No. 37, PageID.549-550; Government's Exhibit B].

While initialing the form, Young asked Officer Tobel whether ATF stood for Alcohol, Tobacco, and Firearms and stated that he was not involved with any of those and had never had a gun charge. [Gov. Ex. A, at 1:40–2:01]. Officer Tobel then asked Young what grade level he had completed in school, and Young replied that he had completed the eleventh grade. [*Id*. at 2:07–2:15]. Officer Tobel asked if Young was under the influence of drugs or alcohol, to which Young responded that he had taken some Xanax and Oxycodone that morning around 9 a.m. [*Id*. at 2:27–2:47]. Officer Tobel questioned Young regarding how he had obtained those drugs since he had been in the jail overnight. [*Id*. at 2:48–3:10]. Young stated that he would not disclose his "secrets." *Id*. When asked a second time what time he had taken the drugs, Young stated around 10 a.m. or 11 a.m. [*Id*. at 3:27–3:30]. When asked if he was currently high, Young replied, "I'm a little high." [*Id*. at 4:29–4:36].

Officer Tobel testified that he continued the interview because Young was responding, asking questions, knew what ATF stood for and understood what was going on. [ECF No. 37, PageID.556]. Officer Tobel then began questioning Young about a prior shooting incident in which Young sustained a gunshot wound to the hand and an unrelated individual was also shot. [Gov. Ex. A at 5:21–5:39]. During the interview, Young volunteered what he remembered about the incidents he was questioned about and even posed his own questions to the officers. [*See e.g*., Gov. Ex. A, at 1:40–2:01, 5:45–13:03, 30:35–30:43, 33:09–33:22, 35:50–37:57, 1:00:42–

1:01:31]. His comments and questions were lucid and clear, as were his answers to the officers' questions. *Id*.

### 2. Custodial Interrogation Analysis

Under the Fifth Amendment, a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "In *Miranda*, the Supreme Court determined that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination." *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). "The inquiry as to whether there was a valid waiver has two components." *United States v. Wilkerson*, 76 F. App'x 657, 660 (6th Cir. 2003). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. "The ultimate question is 'whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.'" *Holland v. Rivard*, 9 F. Supp. 3d 773, 787 (E.D. Mich. 2014), *aff'd*, 800 F.3d 224 (6th Cir. 2015) (quoting *Miller v. Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985)). "The government bears the burden of

proving, by a preponderance of the evidence, that *Miranda* rights were voluntarily and knowingly waived." *United States v. Binford,* 818 F.3d 261, 273 (6th Cir. 2016).

Young moves this Court to exclude his recorded statements made on August 3, 2024, to ATF Agent Smith and Officer Tobel during the custodial interview. [ECF No. 19, PageID.53]. Young asserts that he informed the officers during the interview that he was "a bit high" because he had "took zanax [*sic*] or oxycodone around 10:00 a.m." [*Id*. at PageID.53-54]. Despite Young's admission, Officer Tobel continued his interview of Young. [*Id*. at PageID.54]. Young asserts that he made potentially incriminating statements regarding a Draco firearm used in the June incident that was tied to the fired cartridge casing allegedly removed from his pocket on May 31, 2024. *Id*.

The Parties agree that Young was subjected to a custodial interrogation and was therefore entitled to the protections set forth in *Miranda*. [ECF No. 29, PageID.298]. Young argues that his *Miranda* waiver was not voluntary. Young claims he lacked the capacity to voluntarily waive his rights because he: (1) was under the influence of Xanax at the time of his interview and so informed the agents; (2) was only 20 years old; and (3) only had an 11th grade education. [ECF No. 18, PageID.60].[2]

---

[2] Young also appears to assert that the two officers coerced him into waiving his rights by questioning him "in a small, locked room at the Macomb County Jail, for

Relying on *Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009), Young argues that the officers should have reasonably known that, for a suspect under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call the voluntariness of his confession into question. [*Id*. at PageID.59]. However, Young concedes that the Supreme Court in *Colorado v. Connelly* has held that "a defendant's deficient mental condition by itself, is insufficient to render a waiver involuntary." [*Id*. at PageID.58, citing 479 U.S. 157, 164, 107 S. Ct. 515, 520 (1986)]. Further, Young notes that the Sixth Circuit "has suggested that a defendant must be at or near total incapacitation in order to use intoxication as proof that his confession was involuntary." [*Id*. PageID.59-60]. Additionally, Young contends that his "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." [*Id*. at PageID.60, citing *Stanley v. Lazaroff*, 82 F. App'x 407, 421 (6th Cir. 2003)].

The Government argues that Young's *Miranda* waiver was voluntarily, knowingly, and intelligently obtained based on the totality of the circumstances. [ECF No. 29, PageID.305]. First, the Government contends there is no evidence that Young took any drugs the day of his custodial interview. [*Id*. at PageID.300]. The Government argues that Young's interview took place the day after he was arrested.

---

nearly 1 and ½ hours, continuously without any breaks." [ECF No. 18, PageID.60]. However, Defendant provides no authority or analysis on this issue.

[*Id*. at PageID.293-294]. When Young told agents that he took Xanax and oxycodone the morning of his interview, Officer Tobel asked if the jail provided him the drugs, which Young said no, and that he had the drugs on him when he arrived the prior morning. [*Id*. at PageID.295-296]. When questioned how he could still have drugs on him while in jail, Young refused to answer. [*Id*. at PageID.296].

Second, the Government argues that even if Young had taken drugs, they did not appear to have affected him. [*Id*. at PageID.300]. The Government asserts that Young was alert, responsive, and coherent throughout the interview. [*Id*. at PageID.301]. The Government contends that Young spoke clearly, answered questions appropriately, and did not appear lethargic or slur his speech. *Id*. Third, the Government asserts that there was no evidence of police coercion, which is a prerequisite to a claim of involuntary waiver of *Miranda* rights. *Id*. Instead, the Government insists that the agents interviewing Young were calm, polite, did not raise their voices, and did not make any physical threats. *Id*. Further, the agents did not make any promises to coerce Young to waive his rights. *Id*.

Under the "voluntary waiver" prong of a Fifth Amendment waiver, the Sixth Circuit and courts in this district have addressed whether drug-impaired suspects could satisfy the waiver test. In *Hayek*, the defendant argued he could not consent to waiver of his *Miranda* rights because he drank heavily the night before the interview and took cough syrup before going to bed, leading to a "panic attack" when officers

awoke him the next morning. *United States v. Hayek*, No. 22-5177, 2024 U.S. App. LEXIS 11325, at *9 (6th Cir. May 7, 2024). The Sixth Circuit affirmed the district court's conclusion that the defendant's waiver was valid, because according to the interrogating officers, they did not observe any evidence that the defendant was impaired and that testimony was consistent with an audio recording of the defendant's interview, during which he sounded alert and responsive. *Id*. at *9-10. In *Nero*, the defendant claimed that his statements made during an interview conducted during law enforcement's execution of a search warrant must be suppressed because he was under the influence of crack cocaine, rendering him unable to voluntarily, knowingly, and intelligently waive his *Miranda* rights. *United States v. Nero*, No. 17-cr-20183-5, 2021 U.S. Dist. LEXIS 146759, at *2, *8 (E.D. Mich. Aug. 5, 2021). The court found that the defendant voluntarily waived his *Miranda* rights because the video evidence reflected that the defendant "did not exhibit any unusual behavior and appropriately responded to questions," "was calm, coherent, and lucid," and he was able to recall details such as names of certain individuals and the type of vehicle driven by one of those people. *Id*. at *19-20.

Under the "knowing and intelligent" prong of a Fifth Amendment waiver, the Sixth Circuit has addressed whether drug-impaired suspects could satisfy the test. *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). In *Dunn*, the defendant claimed his waiver was given unknowingly because he was under the

influence of Vicodin and marijuana. *Id*. (citing *United States v. Dunn*, 269 F. App'x 567 (6th Cir. 2008)). The Sixth Circuit upheld the defendant's waiver, noting credible testimony that the defendant was "alert, coherent, and lucid." *Id*. (citation omitted). In *Jones*, the Sixth Circuit rejected a claim that the defendant did not intelligently waive his *Miranda* rights due to intoxication, observing that the "question of [defendant's] incapacitating intoxication, or lack thereof, was simply a credibility issue" and that the lower court had credited the police officer's testimony that any intoxication did not affect the defendant's "competency or volition." *Id.* (citing *United States v. Jones*, No. 90-3693, 1991 WL 105751, at *3 (6th Cir. June 18, 1991) (per curiam)).

Other circuits have likewise upheld *Miranda* waivers where defendants claimed impairment from drugs. *See, e.g., United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) ("[D]efendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination."); *United States v. Cristobal*, 293 F.3d 134, 143 (4th Cir. 2002) ("Medical records indicating that a suspect had been given narcotics, with no supporting evidence as to the effects of those narcotics (on the individual or even in general) are not sufficient to render a waiver of *Miranda* rights unknowing or unintelligent."); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) ("Intoxication and fatigue do not automatically render a confession

involuntary; rather, the test is whether these mental impairments caused the defendant's will to be overborne."). The Tenth Circuit held that a hospitalized defendant recovering from gunshot wounds and under the influence of a painkiller nonetheless knowingly and intelligently waived his rights because he remained "alert and responsive" during questioning. *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002).

The Court finds Young voluntarily, knowingly, and intelligently waived his rights. First, under the totality-of-the-circumstances test, the Sixth Circuit recognizes that "medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing." *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). Because "[d]rug-induced impairment . . . is a matter of degree," a court's inquiry into intoxication should "gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." *Id.* There is no *per se* rule or presumption that intoxication defeats an individual's capacity to consent. *Id.* Accordingly, the consent of an intoxicated individual may still be voluntary when the person is "coherent and fails to exhibit any visible impairment." *United States v. Griffin*, No. 96-5326, 1997 U.S. App. LEXIS 22350, 1997 WL 487325 at *3 (6th Cir. Aug. 15, 1997) (per curiam).

The video of Young's interview, as well as the testimony of Officer Tobel, reflects that Young was calm, coherent, lucid, did not exhibit any unusual behavior, and

appropriately responded to questions. Importantly, when Officer Tobel stated that whatever Young said would be between them, it was Young who reminded Officer Tobel that he had just signed a form stating that "anything I said can or will be used against me in the court of law." [Gov. Ex. A, at 26:14–26:29]. It is evident from the video that Young was able to understand, analyze, and reason during the custodial interview. Although Young stated that he was "a little high," the record does not demonstrate that any impairment prevented him from voluntarily, knowingly, and intelligently waiving his rights. Accordingly, under the totality of the circumstances, the Court concludes that Young voluntarily, knowingly, and intelligently waived his *Miranda* rights.

### C. Motion to Suppress Evidence Seized from Warrantless Search & Seizure of Defendant's Personal Property

#### 1. Evidentiary Hearing on January 8, 2026

During the evidentiary hearing on January 8, 2026, the Government called two witnesses, Mr. Mohamed Bazzi and Agent Brendt Smith.

a. <u>Mohamed Bazzi's Testimony</u>

Mr. Mohamed Bazzi ("Bazzi") was a registered nurse in the emergency department at Corewell Hospital in Dearborn and was working at the hospital on May 31, 2024. [ECF No. 37, PageID.481-482]. Bazzi testified that the patient's initial treating nurse usually inventories the patient's personal belongings upon arrival. [*Id*. at PageID.499-501]. Bazzi was not Young's treating nurse, was not

involved in Young's care, and was not responsible for inventorying Young's belongings. [*Id*. at PageID.482-484]. After Young was transferred to a new room, Bazzi saw Young's treating nurse exit Young's initial room, and he asked if she needed any assistance. [*Id*. at PageID.484-487]. The nurse then asked Bazzi to bag Young's belongings from Young's initial room and transport them to Young's new room. *Id*. While doing so, a spent shell casing fell to the floor. [*Id*. at PageID.486]. Bazzi placed the shell casing in a separate Ziploc bag and placed the Ziploc bag inside the patient belongings bag containing Young's pants and shirt. [*Id*. at PageID.489-490, 515-516]. When he bagged Young's belongings, he was not acting at the direction of law enforcement, was not searching Young's belongings for evidence, and was simply carrying out the nurse's request to transport Young's belongings to his new room. [*Id*. at PageID.486-489, 517].

Bazzi then proceeded toward Young's new room. [*Id*. at PageID.490]. Upon reaching the room, Bazzi encountered a police officer outside and told the officer that the bag with Young's belongings contained a shell casing and asked whether the belongings should be brought into the room or kept off to the side. [*Id*. at PageID.490-491, 506, 518-519]. The officer responded to Bazzi's inquiry by telling him to leave the bag behind the nurses' station, and Bazzi complied. [*Id*. at PageID.491, 506, 518-519]. Bazzi testified that, under normal procedures, Young's belongings would have accompanied Young to his new room. [*Id*. at PageID.507].

Instead, in accordance with the officer's request, the belongings were left behind the nurses' station. [*Id*. at PageID.491, 507-508, 519]. After leaving the bag behind the nurses' station, Bazzi had no further contact with either the police officer or Young's belongings that day. [*Id*. at PageID.508].

b. Agent Brendt Smith's Testimony

Agent Brendt Smith was the ATF case agent assigned to Young's case and testified that he was aware that a spent shell casing had been recovered from Young's clothing at Corewell Hospital on May 31, 2024. [ECF No. 37, PageID.523-526]. Smith testified that Mohamed Bazzi was the first person to recover the shell casing and that Detroit Police Officer Bryant ultimately took physical custody of the shell casing. [*Id*. at PageID.526-527]. Smith testified that the shell casing underwent a preliminary NIBIN comparison. [*Id*. at PageID.529-530]. Smith explained that NIBIN is a preliminary comparison tool that compares images of fired cartridge casings to identify potential investigative leads based on similar tool markings, but that NIBIN is distinct from forensic analysis and does not involve forensic testing. [*Id*. at PageID.531-533]. Although Smith testified that a preliminary NIBIN comparison had been performed, he could not recall whether any forensic testing or laboratory examination of the shell casing had occurred or whether he had submitted the shell casing for such testing. [*Id*. at PageID.533]. Finally, Smith testified that, to

his knowledge, neither federal nor state authorities obtained a search warrant to seize the shell casing or retain it for scientific analysis. [*Id*. at PageID.531].

**2. Continued Evidentiary Hearing on February 4, 2026**

The evidentiary hearing was continued to February 4, 2026, for argument on the motions. As a preliminary matter, the Parties stipulated that the shell casing underwent a preliminary NIBIN analysis by police evidence technicians, which involved photographing the shell casing and uploading the photographs to a database. The Parties further stipulated that the shell casing was not subsequently sent to a laboratory for forensic testing by a forensic scientist and remained in ATF custody.

Defendant argued that the warrantless retention and subsequent testing of the shell casing violated the Fourth Amendment. Defendant maintained that although Bazzi initially discovered and bagged the shell casing without police involvement, the relevant seizure occurred when Bazzi encountered the DPD officer outside Young's new room. Defendant argued that although the normal procedure was for Young's belongings to accompany him to his new room, Bazzi approached the officer, informed him of the shell casing, and asked what he should do with the belongings. The officer then instructed Bazzi to keep Young's belongings outside the

room and place them behind the nurses' station, which Defendant argued constituted a warrantless seizure and demonstrated police involvement in Bazzi's actions.

Defendant further argued that no exception to the warrant requirement justified the seizure. Defendant contended that the shell casing, standing alone, did not constitute evidence of a crime involving Young because hospital personnel did not know Young's criminal history or otherwise know that his possession of the casing was unlawful. Defendant also disputed any justification based on the potential loss or destruction of evidence, arguing that by the time any preliminary NIBIN analysis occurred, the shell casing had already been secured behind the nurses' station and was no longer in Young's possession. Defendant maintained that after the warrantless seizure, authorities subjected the shell casing to testing that went beyond Bazzi's initial private conduct. Defendant therefore sought suppression of both the shell casing and the results of any preliminary or additional testing performed on it.

The Government argued that the seizure of the shell casing did not violate the Fourth Amendment because the initial seizure was conducted by Bazzi, a private actor, rather than law enforcement. According to the Government, the seizure occurred when Bazzi picked the shell casing up from the floor and placed it in a separate bag. Because no law-enforcement officer directed Bazzi to retrieve the casing, the Government maintained that his conduct constituted a private seizure outside the scope of the Fourth Amendment. The Government further argued that

Bazzi voluntarily brought the shell casing to the officer and offered it to him by asking whether the belongings containing the casing should be brought into Young's room or kept elsewhere. The Government contended that the officer's acceptance of the casing and instruction that the belongings be placed behind the nurses' station did not transform Bazzi into a government agent or otherwise bring the private seizure within the scope of the Fourth Amendment.

The Government also argued that no additional warrant was required to conduct the preliminary NIBIN analysis after law enforcement lawfully obtained the shell casing. The Government asserted that physically examining the casing did not constitute a separate search and that Young had no reasonable expectation of privacy in the spent shell casing. The Government acknowledged the Parties' stipulation that the casing was not subjected to additional forensic analysis by a forensic scientist but maintained that even such testing would not have required a separate warrant.

Alternatively, the Government argued that even if the officer's conduct constituted a government seizure, the seizure was lawful under the plain-view doctrine. The Government acknowledged that there was no evidence that the officer knew Young was a felon when he encountered the casing but argued that the casing's incriminating nature was nevertheless immediately apparent because the officer was outside the hospital room of a gunshot victim and encountered a spent shell casing among that patient's belongings. The Government asserted that the casing was

evidence of a shooting regardless of whether it established that Young himself had committed a crime.

### 3. Warrantless Search & Seizure Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Minnesota v. Carter*, 525 U.S. 83, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). The Fourth Amendment requires a warrant to conduct a governmental search and seizure. *Id.* To seek protection under the Fourth Amendment, a defendant must demonstrate that he possessed a legitimate expectation of privacy in the area searched. *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005). Warrantless searches presumptively violate the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (footnote omitted). The Sixth Circuit has identified four circumstances in which the Supreme Court recognizes exigent circumstances: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a subject's escape; and (4) risk of danger to the police or others. *United States v. Johnson*, 457 F. App'x 512, 516 (6th Cir. 2012) (citing *United States v. Williams*,

354 F.3d 497, 503 (6th Cir. 2003); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).

The protection of the Fourth Amendment, however, only applies to government action. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). The Fourth Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Id*. (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980) (Blackmun, J., dissenting)).

Young's motion seeks to suppress the ammunition evidence for four main reasons: (1) his property was searched and seized without a warrant; (2) there were no exigent circumstances to justify a warrantless search; (3) he did not consent to the search or seizure of his property; and (4) the seized ammunition is the fruit of an illegal search. [ECF No. 19]. The Government argues that there is no Fourth Amendment violation because Young's property was seized by hospital staff who are private parties, not government agents. [ECF No. 30, PageID.317-322]. The Government also contends that even if the Court does not apply the private party doctrine, the seizure was justified by the exigent-circumstance and plain-view exceptions. [ECF No. 30, PageID.322].

The Court first considers the Government's argument as to whether the Fourth Amendment is applicable to this case.

Young's motion asserts that DPD Officer Kevin Bryant[3] directed the nurse to hold onto Young's clothing and not release it to him. [ECF No. 19, PageID.67]. Young contends that, pursuant to the officer's request, the nurse made an inventory log of Young's property and clothing. *Id*. While making this inventory, the nurse allegedly recovered a spent shell casing from Young's clothing and told Officer Bryant about the shell casing. *Id*. Officer Bryant then seized Young's property and clothing and had the shell casing examined by DPD evidence technicians. *Id*.

The Government argues that a nurse who had not been involved in Young's treatment but was merely assisting with Young's transfer from the emergency room to another hospital room found the ammunition. [ECF No. 30, PageID.314-315]. The Government asserts that when the nurse picked up Young's property and clothing to place them in a bag for transport, a spent shell casing fell out of the clothing and onto the floor. [*Id*. at PageID.315]. That nurse placed the shell casing in a specimen bag and took it along with Young's property to the treating nurse. *Id*. The treating nurse then went to inform Officer Bryant about the ammunition found

[3] Officer Bryant did not testify at the evidentiary hearing.

in Young's clothing and asked what she should do with the casing. *Id*. Officer Bryant told her to hold on to it until he could speak with detectives. *Id*.

At the evidentiary hearing, Bazzi's testimony was largely consistent with the Government's characterization of the facts. Accordingly, in his supplemental brief, Defendant concedes that the nurse's discovery of the casing was a private search occurring without any police involvement. [ECF No. 39, PageID.585].[4] Instead, Defendant argues that because Officer Bryant directed Bazzi to depart from hospital protocol and to place Young's belongings behind the nurses' station rather than taking them into Young's room, Officer Bryant encouraged and participated in the seizure, satisfying prong one. *Id*.

In its supplemental response, the Government, citing *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir. 1985) and *United States v. Bowers*, 594 F.3d 522, 526 (6th Cir. 2010), argues that the Sixth Circuit case law provides that when a private actor obtains an item and then turns it over to law enforcement, the seizure is completed by a private actor, not the government, and therefore the Fourth Amendment is not implicated. [ECF No. 40, PageID.597]. The Government contends that Bazzi was not a government agent because Bazzi seized the casing before the officer even knew

---

[4] At the continuation of the evidentiary hearing on February 4, 2026, defense counsel conceded that the initial discovery by Bazzi of the spent shell casing was not a search and is no longer being challenged.

of the shell casing's existence. [*Id*. at PageID.598]. Therefore, the officer could not have "instigated, encouraged, or participated" in the seizure. *Id*. Further, the Government argues that Young's argument that Officer Bryant encouraged or directed Bazzi to give him the casing and therefore Officer Bryant participated in the seizure should be rejected. [*Id*. at PageID.599]. The Government contends that Bazzi voluntarily brought and offered the casing to Officer Bryant first and that Officer Bryant's acceptance of the casing does not constitute a seizure under the Fourth Amendment. *Id*. Additionally, the Government asserts that under *United States v. Clutter,* 914 F.2d 775, 779 (6th Cir. 1990), a private party's search does not implicate Fourth Amendment protections even if the conduct was unreasonable. [*Id*. at PageID.598-599]. Therefore, whether Bazzi followed hospital procedures when he voluntarily gave the casing to the officer is irrelevant to the legality of the seizure. *Id*.

The Sixth Circuit uses a two-factor test in determining whether a private party is acting as an agent of the government such that the Fourth Amendment applies. *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). The defendant must show that: (1) law enforcement "instigated, encouraged, or participated in the search" and (2) the individual "engaged in the search with the intent of assisting the police in their investigative efforts." *Id.* The defendant must establish both prongs before the Fourth Amendment applies. *Id*. If the intent of the

private party conducting the search *is entirely independent* of the government's intent to collect evidence for use in a criminal prosecution, then the private party is not an agent of the government. *United States v. Hardin*, 539 F.3d 404, 418 (6th Cir. 2008) (emphasis in original) (quotations omitted).

The present facts are analogous to the facts presented in *United States v. Clay*, No. 5:06-CR-83-S-JMH, 2006 U.S. Dist. LEXIS 58061 (E.D. Ky. Aug. 17, 2006). In *Clay*, after the nurse independently discovered cocaine and ammunition while searching the defendant's coat pursuant to hospital procedures, she notified her supervisor, and the items were turned over to a police officer who had accompanied the defendant to the hospital. *Id.* at *2. Notably, the nurse and the officer had no conversation before the search concerning any possible criminal activity by the defendant. *Id.* at *4. Nevertheless, the court denied suppression, concluding that the nurse's discovery was not undertaken in furtherance of a law enforcement purpose. *Id.* at *4–5.

Similarly, law enforcement had no involvement in Bazzi's handling of Young's belongings or discovery of the shell casing. As in *Clay*, there was no communication between Bazzi and law enforcement concerning Young's belongings or possible evidence before Bazzi discovered the shell casing. After independently discovering and bagging the casing, Bazzi approached the officer, informed him that the bag contained a shell casing, and asked whether the belongings should be brought into

Young's room or kept off to the side. The officer responded by telling Bazzi to leave the belongings behind the nurses' station. Therefore, as in *Clay*, law enforcement became involved only after hospital personnel had independently discovered the evidence.

Nor did the officer's subsequent involvement render the seizure unconstitutional. In *United States v. Lambert*, the Sixth Circuit explained that "there is no seizure within the meaning of the Fourth Amendment when an object discovered in a private search is voluntarily relinquished to the government." 771 F.2d 83, 89 (6th Cir. 1985). Here, Bazzi voluntarily brought the already-discovered shell casing to the officer's attention. The officer did not approach Bazzi and demand the casing or direct Bazzi to retrieve Young's belongings. Rather, Bazzi approached the officer, informed him that the bag contained a shell casing, and asked whether the officer wanted the belongings brought into Young's room or kept off to the side. Only in response to Bazzi's inquiry did the officer tell him to leave the belongings behind the nurses' station. The Sixth Circuit has found that similar post-discovery interaction with law enforcement does not transform a private party into a government agent. *See United States v. Powell*, 836 F. App'x 391 (6th Cir. 2020). In *Powell*, after independently discovering contraband, a hotel employee asked officers whether she could remove it, waited for their response, and testified that she would have left the contraband in place had the officers instructed her to do so. *Id.* at 392-

93. After the officers told her that she could remove the package, the employee removed it from the refrigerator and approached the officers. *Id.* at 393. An officer then took the package, recognizing that it contained fentanyl. *Id.* The Sixth Circuit concluded that the employee was not acting as a government agent, emphasizing that agency requires both police participation in the search and an intent by the private party to assist law enforcement. *Id.* at 397. Even assuming the interaction between the employee and the officers constituted police participation, the employee had acted with an independent purpose rather than an intent to assist a police investigation. *Id.* at 397–98.

The same reasoning applies here. Bazzi discovered and bagged the casing while carrying out the independent purpose of transporting Young's belongings to his new room. He did not act at the direction of law enforcement or with the intent to assist a police investigation. His subsequent decision to approach the officer and follow the officer's direction regarding where to leave the belongings did not transform him into a government agent. Accordingly, the officer's response to Bazzi's voluntary disclosure and relinquishment of the previously discovered shell casing did not constitute a seizure under the Fourth Amendment.[5]

[5] In its response brief, the Government argued, in the alternative, that if the Court did not find that the search was conducted by a private party, the plain-view and exigent circumstances exceptions applied. [ECF No. 30, PageID.322-327]. Defendant opposed the application of these exceptions in his supplemental brief.

In his supplemental brief, Defendant argues that the comparison, testing, and analysis of the shell casing exceeded the scope of the private search. [ECF No. 39, PageID.585-589]. Defendant argues that Officer Bryant conducted two warrantless searches of the casing when: (1) Officer Bryant had evidence technicians examine the casing and compare it to others found at the shooting scene; and (2) police sent the casing out for NIBIN analysis. *Id*. At the evidentiary hearing, however, the Parties stipulated that the shell casing was not sent to a laboratory for forensic testing by a forensic scientist and remained in ATF custody. Therefore, the remaining issue is whether the examination and comparison of the casing violated the Fourth Amendment. Defendant, citing *United States v. Jacobsen*, 466 U.S. 109, 115-16 (1984), asserts that "additional invasions of privacy by the government, beyond that committed by a private party, must be tested by the degree to which they exceeded the scope of the private search." [*Id*. at PageID.588-589].

The Government contends that the Court should reject Young's argument that a warrant was required for the subsequent physical examination of the shell casing, because he raised this issue for the first time in his supplemental brief and no evidence was presented at the evidentiary hearing on this issue. [*Id*. at PageID.600]. The Government argues that Young cites no evidence to support his position that an

---

[ECF No. 39, PageID.586-589]. Because the Court concludes that the Fourth Amendment was not violated, it need not consider whether the plain-view or exigent circumstances exceptions apply.

additional warrant was needed to physically examine the casing. [*Id*. at PageID.600-601]. The Government asserts that once the casing was lawfully seized and in police custody, the officers were permitted to physically examine and photograph it. [*Id*. at PageID.601]. Further, even if examining and photographing the casing did constitute a search, the Government contends that Young had no expectation of privacy in the physical components of the casing that would require a warrant to examine it. *Id*. The Government asserts that the same logic applied in cases involving the seizure of drugs applies here. *Id*. According to the Government, officers are not required to obtain an additional warrant to field test lawfully seized drugs. *Id*. (citing *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)).

The Court agrees with the Government. In *United States v. Jacobsen*, 466 U.S. 109 (1984), employees of a private freight carrier opened a damaged package and discovered plastic bags containing white powder. *Id.* at 111. After the employees notified federal authorities, a DEA agent reopened the package, removed the plastic bags, visually examined their contents, and subsequently removed a trace amount of the powder and performed a chemical field test that identified the substance as cocaine. *Id.* at 111–12. The Supreme Court explained that, because the initial examination was conducted by private parties, the relevant Fourth Amendment inquiry was whether the subsequent governmental intrusion exceeded the scope of the private search. *Id.* at 115–16. The agent's visual examination did not constitute a

Fourth Amendment search because it enabled him to learn nothing that had not already been learned through the private search. *Id.* at 119–20. The subsequent field test, however, exceeded the scope of the private search because the private employees had conducted no similar test. *Id.* at 122. The Court nevertheless concluded that the field test did not violate the Fourth Amendment because it could reveal only whether the substance was cocaine and therefore did not compromise any legitimate privacy interest. *Id.* at 122–24.

Here, before law enforcement examined the shell casing, Bazzi had already discovered the casing, separately bagged it, disclosed its existence to Officer Bryant, and voluntarily turned it over to law enforcement. As such, the existence and physical appearance of the casing had already been exposed through Bazzi's private conduct. Further, the casing was discovered among the belongings of Young, who was being treated in the hospital for a gunshot wound. Accordingly, before any subsequent examination or comparison occurred, law enforcement knew that the object was a spent shell casing discovered among the belongings of a gunshot victim.

Law enforcement subsequently conducted a preliminary NIBIN analysis of the casing. As Agent Smith testified, that process entails uploading images of a fired cartridge casing into a computer database containing images of other recovered casings. [ECF No. 37, PageID.532-533]. The database may then generate a lead indicating that two casings have similar markings and may have been fired from the

same firearm. [*Id*. at PageID.530, 532-533]. Agent Smith testified that this process does not entail forensic testing and that forensic analysis is separate from the preliminary NIBIN analysis. [*Id*. at PageID.532-533].

To the extent law enforcement examined and photographed the already-exposed physical characteristics of the casing, that conduct is analogous to the DEA agent's reexamination of the substance already exposed by the private search in *Jacobsen*. The NIBIN comparison, however, could reveal additional information concerning the casing's potential connection to casings recovered from other shooting scenes and therefore exceeded the scope of Bazzi's private conduct. But *Jacobsen* makes clear that this conclusion does not end the Fourth Amendment inquiry. Although the field test in *Jacobsen* likewise exceeded the scope of the prior private search, the Supreme Court held that the additional testing did not violate the Fourth Amendment because it did not compromise a legitimate privacy interest. *Id.* at 122–24.

The same is true here. Young identifies no legitimate expectation of privacy in the physical characteristics and markings of the shell casing that would require law enforcement to obtain a warrant before examining and comparing those characteristics. The casing had already been discovered through a private search and was lawfully obtained by law enforcement before the challenged examination occurred. The NIBIN analysis did not expose concealed contents of Young's property. The analysis used images of the physical markings on the already-exposed

casing to determine whether those markings were similar to markings on other recovered casings. Accordingly, the examination, photographing, and preliminary NIBIN comparison of the shell casing did not infringe a legitimate expectation of privacy requiring a warrant.

## IV. CONCLUSION/ORDER

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [ECF No. 17] is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statements [ECF No. 18] is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Evidence [ECF No. 19] is **DENIED**.

**SO ORDERED.**

Dated: September 14, 2026

s/Denise Page Hood
Denise Page Hood
United States District Judge